Case number 20-1505, Samantha Burwell v. City of Lansing, MI et al. Oral argument not to exceed 15 minutes per side. Mr. Feger for the appellant. You may proceed Mr. Feger. Thank you very much, Your Honor. And good afternoon, Jeffrey Feger. May it please the court on behalf of the estate of Christopher Phillips, who, as I'm sure you all know, died of multiple drug intoxication in the Lansing City Jail. I think on reflection that this is an important case for a number of reasons. Coincidentally, the House of Representatives addressed today whether the traditionally created doctrine of qualified immunity should even continue to exist. And I also read that there was a minor dispute in a case filed today in the Supreme Court with two justices, one in the majority, one in the minority, claiming that the other was engaged in judicial activism, which, of course, the doctrine of qualified immunity is a product of. This case is also important because the net result of this case to suggest that in a case where Lansing acknowledges the existence of a serious medical condition. But has its jailers disclaimed ever seeing a man laying in a jail cell in a pool of vomit for many hours as in there for not being subjectively aware of the need for medical care points to and then to immunize these individuals. As a result of that claim, judicially immunize them. Why have jail checks? Why do them at all? Why do welfare checks at all? You can ask yourself if the product of this judicial immunization is to allow jailers to disclaim responsibility and evade liability for a man dying of a multiple drug overdose laying in his vomit in a cell. For many hours by simply claiming they didn't see it or they thought he was sleeping and therefore there's no subjective component is to encourage no jail checks at all. Yeah. So I have a question about kind of about that, but more so about what is the specific evidence? I agree with you. They were it seems negligent at at best in not checking the jail cell when they were supposed to. But I guess what's your best evidence that they actually saw him in the vomit and who would that pertain to since liabilities individual? Absolutely. And that's a fair, fair question. And I was just about to address that. The overwhelming evidence because the trial court just ignored apparently these facts and stated facts which are contrary to the record. The trial court indicated, quote, that although Odekirk and Kelly specifically. Now, let me address your question. Odekirk and Kelly were found guilty of failing to do their cell checks, quote, from trial court. There is no evidence in the record that either of them knew or had any reason to know that Phillips was in distress. That's absolutely contrary to the record. All the court had to do was cite, which it did not. The internal investigation, which I quote as to Kelly at 1557, Kelly placed another detaining Wilson into cell three with Phyllis. Can I ask that, counsel? And I'm sorry to do so. I know you're reading, but I have a specific question. I agree with you. I read that. But disc three is missing. Do you know why is the disc missing? So disc three is the disc where Kelly places the other inmate, the one that's dancing on the left, I think, in the cell, right? Yeah, I don't know why it's missing. And we may have to supplement the record because we have an internal investigation report, which says that you can clearly see. And the internal investigators clearly saw, quote, Phillips lying motionless on the floor with a pile of vomit coming out of his mouth. And Kelly failed to act. I'm sorry to interrupt you, but you can see that in disc four, but that's not in the time period where Kelly went in the cell, if that makes sense. It does, but it doesn't. It does, but it doesn't because the situation didn't change. The situation was always that. Well, not always. He didn't have vomit the whole time, right, because disc two shows him kind of I think it's he's wavering and things like that during disc two. So at some point during disc three, I think it is. But you should correct me if I'm wrong. He vomits. And disc three is at least we don't have it. You all may have it, but we don't. At least I could. I didn't have it. Well, I have a responsibility then to get that to you. But I am and I will. And I am referring now to the investigation, the internal investigation, which found that Kelly saw or had could not possibly disclaim seeing it. And Otakirk could not, doing her job, could not disclaim seeing it. So can we discuss Otakirk? Because I agree with you on Kelly based on the evidence in front of us when viewed in your favor. But on Otakirk, there's no evidence like there is with Kelly. There's evidence that she was negligent. There's no evidence that she went in, at least that I found, and actually would have had to see him with the vomit. Isn't that accurate? Yes and no. She disclaims having done that, although that is her only job in terms of cell checks. She has to go by the cell. She has to notate that she conducted a cell check. I'm just looking for the subjective component. And that's what I'm saying. Subjectively, it can't solely be a disclaimer by the perpetrator that they didn't see it. There have to be, at least from our perspective, an inference, an ability to make a reasonable inference by the jury that she couldn't have not seen it. That's my point. You have to submit affirmative evidence from which a reasonable jury could conclude she saw. My point is the cell checks alone aren't enough because at the same time you claim she wasn't doing her job. No, I don't. I don't agree with that because her only job is to make sure that the detainee is okay. If you're lying, dying in a pool of vomit, and you say, I didn't look at it, and I was doing my job, then I guess there's two reasonable possibilities. You don't do your job, or actually you did see it, and you're just lying to get out of the liability. And that's a reasonable inference. Otherwise, you are immunizing. My point is to say otherwise is to immunize all jail personnel from doing cell checks. All they have to do to convince a court of law is that they subjectively looked at nothing. They wore blinders. That's the Nuremberg of things. That's a policy argument, and we have qualified immunity, and you have a body of law that you're stuck with, at least until the Supreme Court changes it. Right. Are you saying that because she logged in and said effectively that I did my cell check, that is affirmative evidence that she in fact did it? And if she did it, she would have seen it. And therefore, the jury can conclude based upon her own representation that she did the check that she saw. That's correct. Otherwise, we're advocating what I said, and I'm not saying this glibly, the Nuremberg defense. I saw nothing. I heard nothing. Therefore, I can't be responsible. That's exactly right, Your Honor, Judge White. So can I ask one other question, Judge White, or were you done? I'm done. So she goes by, and I'm still on Outterkirk, not Kelly, who I agree with you on, but on Outterkirk, she does her second cell check at 3.05. She doesn't start vomiting, according to the record, until 3.23. Correct. But at 16.29, she did another one, and the investigation concluded that she could not have not seen him laying in a pile of vomit for over 45 minutes, 16.29. And that's where she's supposed to perform a cell check, swipe the reader, but apparently at least claims didn't look inside. And we don't, in the disc four, you can't see anything, correct, as to her? That's correct. But she claims to have one time done her job, and then to defend herself in this case, Your Honor, she says, I didn't see or look, which is preposterous, and the jury conclude as a result of her claiming to have done her job that she could not have not seen. And that is a reasonable inference. Your time is up, unless it's another question from the panel. You'll have your rebuttal time. Thank you, Judge Gibbons. Okay, Mr. Mandel. Yes, thank you very much, Your Honor. Scott Mandel representing the athletes in this case. I'd like to go back to what the trial court did in its opinion, and the express representation made to the trial court by the appellees counsel. The trial court references this, they specifically stated and represented that none of the detention officers observed Mr. Phillips medical crisis, which was their admission, and the trial court talked about that. And just to understand your questions, but vomit in and of itself does not mean a medical crisis. Well, wait, when Kelly went in at 357 it's undisputed he went into the cell. And when you look at the video, it's pretty obvious that vomit is lying there. Are you saying he can see someone passed out in vomit and turn around and walk away and do nothing. And there's no, there's no constitutional violation potentially. Can I respond to the factual basis when I answer that, Your Honor. Yes, definitely. Okay, thank you very much. Okay, so you said passed out. Again, what we have here is at least from the record with detention officers believe was that Mr. Phillips was asleep, as opposed to pass out the vomiting itself. The officer who was deposed who was involved in this investigation that Mr. Feiger talked about. I'm talking about the internal investigation. Right. So that's what Mr. Feiger is referring to as far as the investigation goes, did not in any way state what Mr. Feiger is indicated, which is, it was observed as far as this pool of vomit that the courts questioning, which she explained is, yes, you indeed can see it on the videotape, the vomit itself, but she is not in any way saying that that means the detention officer who's walked in has seen that. What she explained was for her to come to that conclusion. But let me walk you through the way I see it and then you tell me where I'm wrong. Lying on the floor. Vomit in front of them. The plaintiff can submit a disk, meaning this six and seven showing the vomit. We know Kelly places another inmate in the cell at 357. Why couldn't a jury reasonably conclude that Kelly saw the vomit because they'll be able to see what Kelly saw and disregarded. The last part in disregarded. Yeah, and ignored it and walked away. Again, I think what a jury could do with respect to that, even if you're right, that does not mean medical distress. It does not mean that Kelly has reason to believe that there's medical distress. And this is what the plaintiffs under in the case before the trial court conceded that none of them that would include Kelly. This is their words. Observe Mr. Phillips in a medical crisis. Assume that a jury would conclude that, yeah, he should have saw he did see this vomit, even though he says he did not see it. The officer who's talking about it says it's a different view. What you're referring to is from up on high a camera versus someone who is down in there doing other tasks. He's bringing another person into the cell. So he's not just looking at Mr. Phillips in that position. So, again, I what even if you concede that there is, if you do find that that is something a jury could determine, that doesn't mean it's a medical crisis. And I think what we're missing here is the undisputed fact that here we have a situation where the Mr. Phillips, the detainee, was asked at booking. And this is on the videotape as well. We have testimony. We have the videotape. He's asked at booking specifically if he has taken drugs. He denies that other than prescription drugs. Is this the it's all his fault, his own fault defense? No, it's not that it's all his fault, but it is a factor to take into consideration with respect to the detention officers. Again, it may be it may be as to whether they're the proximate cause of his death. It seems to me that's a different question than the Eighth Amendment violation. With all due respect, we're dealing with the 14th Amendment because it's a detainee. But that's fine. But with respect to that, it is not a different question. If we're looking at this with the courts, farmer has said this. And in addition to that, the Kingsley case talks about it. You have to look at this from the standpoint of what is known, not 2020 hindsight, but what is known to the officer at the time, not with hindsight. So it's known to the officer at the time is that there were no problems at booking that he appeared to be fine at booking. That's what they knew at the time. They walk him to the cell. All of that could come in in front of a jury. I guess the one question I keep going back to him, maybe I'm struggling and you can explain it to me is we view the evidence in the light most favorable to the plaintiff at this point. You look at the fact that he's lying on the ground with vomit by him. And could a reasonable jury viewing that evidence in light most favorable conclude that he was aware of the problem and disregarded? That's the question that we have to answer, not we weigh the totality of the evidence and say, look, this was object subjectively. He couldn't have because he had all this other stuff in his mind. That's a jury question, isn't it? I don't believe this ultimately is a jury question because, again, you're equating vomit with medical crisis. And that doesn't. Again, there are cases on this vomit in and of itself. Vomit is not enough. And that's why I respectfully submit. If you think when an officer sees someone passed out or asleep, whatever they are with vomit by their mouth coming out or next to their mouth, they have no obligation to do anything. That's the thing that that itself does not trigger the violation that we're talking about. When you say they have nothing to say, it doesn't mean there's a medical crisis. It is not a violation is what I'm saying. It may not be true. The standard doesn't require a medical crisis. It could be a serious medical need of any type. Yes, that's I don't. It doesn't mean he's a good test is not whether he's about to die. Serious medical need. And again, vomit. Again, there are pieces of this vomit in and of itself is not enough. I don't believe that you can even for the purpose of a jury question that you can isolate one fact and ignore the rest. No one is isolating one fact. The facts weren't he vomited. The facts are he was lying in vomit and not moving that that those are multiple facts. Yes, it's true. If a prisoner, you know, says I'm not feeling well, they go they vomit. Sure. But that's that's not this case. We've given you more facts. He's vomiting. He vomited and he's lying in it. And do you have any cases that say that that is not something that serious enough to require medical attention? Prior, Your Honor, vomit, not objectively serious medical need in and of itself. Was the person lying in it? I don't have that in front of me. I'd have to pull the case out. But prior was vomit alone is not enough. And that's on the objective standard, not even on the subjective standard. What's the what's the site 248 what? Let me get that cited that it's 248 federal appendix and I'm looking at 642 of that decision. 248 federal appendix 636 page 642 of that decision. 2007. Prior is spelled P-R-E-Y-O-R. And that's versus City of Ferndale. OK, I thought you were going to tell us whether he was lying in a pool of vomit. We'll look at it. Yeah, I can't tell you that offhand, Your Honor. But again, the vomit alone is not enough. And again, you know, I understand the court's questions on this. We're looking at Officer Kelly, apparently at this point, that that's where the focus is and not on these other officers. And again, with respect to Officer Kelly, what we have here is that he has his cell check himself. And he did not. Again, that's a testimony. He says he did not see the bomb. You're saying it's a fact question whether he saw it or not. And what I respectfully submit is that in and of itself does not trigger this constitutional violation. It may not be perfect conduct. It might be negligent conduct. But it does not rise to the constitutional violation that is required here under Farmer as far as looking at hindsight or otherwise. What about the the argument that on the other officer? The fact that she that there's evidence that she saw based upon the fact that she. Asserted through her her swiping that she did the cell check. Well, that's not evidence that she saw. Again, she her position at that point. Again, she checked that was that she did a cell check. That doesn't mean she saw the bomb. So one would have to say, OK, what would someone who did a cell check at that time have seen? OK, and again, the testimony there has been somebody doing the cell check. That's not the view you're I know you're looking at the videotape, but that's not what they would have seen. They're not up at the same level of the camp itself. So the only testimony in the record is from the officers themselves. And Lieutenant Bayless, who talks about this and says, no, this would not be seen from the level that the officers were in. The officers say that themselves. So again, is that a bad question? I would respectfully submit. No, it's not. But my main point that I'm trying to explain is that this notion of vomit does not in and of itself trigger the need for more medical attention, not in and of itself. And again, that's the prior piece. So, you know, you cannot isolate that from everything else. Counsel to. To agree with your position and uphold the grant. Of some redundant based on immunity, we have to accept that observing an inmate lying in a pool of vomit, not moving is not enough. In light of the rest of the record, I again, I know you're saying there's more facts there. He's lying in a pool of vomit. I understand that point, but not enough. When looked at with the rest of the facts that are not in dispute that he's asked specifically about whether he has ingested drugs. He says, no, I did not. Again, we've got other cases here where different inmates or detainees have also denied that with the courts have said that it does not rise to the level of deliberate indifference. It's an important factor that he denied that. It's an important factor that he when he was brought in to the jail itself, when he was transported there, there's no sign of any sort of intoxication, drug problem or otherwise. At Bookman, there was no sign of that. He was cooperative. He was responsive. There was no indication of any of that. And Kelly also had drugs. I'm sorry. He two of the three drugs that were mentioned. He was taking pursuant to a prescription, right? I don't know. I know he had prescription drugs. I don't know two of the three where I do know that what he did not have a prescription for was the oxycodone, which was the very high level. Again, according to the autopsy report in the toxicology, very high level of oxycodone, non-prescribed. So, and again, that he would never been in the jail itself had he responded that he indeed had taken those drugs. So I, Mr. Mandel, I agree with you that prior condition or I don't know that you said this was much more serious or at least obviously serious based on the way we described the facts in that case. But this is the sentence about vomit that I found on more than one occasion prior vomited a large amount of green vomit on the floor, which was a clear manifestation of an internal physical disorder. That sounds like a serious medical need to me. In prior you're talking about. I'm reading right from prior. Yeah. Okay. So, how is, I guess I don't see that as saying what you said it says or in your brief you say, rather this circuits cases have considered the presence of vomit as being a manifestation of a serious medical need. Such as well, but not an objectively serious medical need in and of itself, but I don't see that last part of the sentence in prior. It says serious physical disorder. That sounds like a serious medical need to me. Okay. My understanding is it says that it's that vomit is not objectively serious is a medical need in and of itself all by itself. Okay. All right. White pointed out there's more facts than just vomit. I understand that, again, there are more facts and vomit but there's more facts than just the vomit to you cannot ignore the rest of this is what I'm saying it's got to be in context. It's what the officer knew at the time knew at the time. That's the rest of this. It's not just isolating on when he's in the cell with the vomit at that one point in time, without regard to the rest. I think we've, I think we've heard your point is that you'll have your rebuttal or rebuttal your honor I would just hope that no reasonable court would ever find that a man lying motionless on a floor with a pile of vomit quote coming out of his mouth does not constitute a serious medical condition. As advocated by the defendant. Mr fire Can I ask you one question unrelated to that if I may, about the proximate cause, what, what is your, what do you believe is the proximate cause of his death. They are to provide medical care and treatment in a timely fashion, so that he doesn't die of medical of a multiple drug overdose. I believe that our expert witnesses will provide testimony by soon. We'll start with. And again, I don't have that at the tip of my tongue, but I think any qualified medical doctor including the pathologist will testify that the sooner you obtain medical treatment better and better and assuming he wasn't. Let me interrupt you I'm sorry but if you look at your expert report that you submitted because we have to look at what you submitted to the district judge. It says, had any of the jail staff properly reviewed the monitors and properly conducted at one hour but this isn't a medical expert, this is a law enforcement officer, and then you go back to Michigan law. It says it has to be the proximate cause it must be the most immediate efficient and direct cause of his dad. No, not for a constitutional violation, that's for a state violation that is not for a constitutional, it may be a proximate cause not the. Okay, and maybe I'm wrong I thought you were bringing both a I'm not talking about the constitutional violation I apologize. I thought you were also bringing a gross negligence claim but maybe that's correct. That's correct. That's okay. You are correct as to the state, requiring the proximate cause. That's great. And so what is the evidence from which we can conclude that one of the officers or one of the jail staff tell us who, and then what's the evidence we can point to to show they are the most immediate positive. Because if they did what they were supposed to do, he would have survived. Who is, and who is that person will start with Kelly Kelly had at 350, excuse me 1557 had called EMS personnel which exists right in that building. And what would have survived when what medical evidence there in seconds. What medical evidence do you have that and why would that be when you look at the ray case out of the Supreme Court of Michigan. Why would that be the proximate cause versus the ingestation of drugs which led to his death, why wouldn't that be the most as you the autopsy itself says and you quoted multiple drug intoxication. And you're absolutely right, that would be the argument of the defendants, they would argue that the most proximate cause of his death was the drugs itself, which points out almost the absurdity of having the versus a proximate cause Michigan is rather unique in that regard, because it creates situations that you point out, honestly are quite quite honest rationally are absurd. I agree. That's not our call. Go ahead, judge. Well, I was going to say was I was going to suggest that when you start talking Mr Fager stop. Yes. Um, well that's all right Mr Fager let me ask you one other question. I. So, the way I read Michigan law and you probably know it a lot better than me is under Ray we look at the negligent actors. And then we say what's the most immediate cause of death and on summary judgment we look at the evidence and the evidence here is only the autopsy that says he was, he died of multiple drug intoxication. So that does support the defendants here and we don't have any evidence that a specific actor, had they intervene for example out Kirk at 326 or something someone intervened at a specific time that that would have saved him, if that makes sense. And so without that how can isn't the only evidence that the, the most immediate cause of death is multiple drug intoxication which is ingestion of that which obviously we don't have any evidence the officers gave him drugs. I wouldn't concede that but that wasn't even an issue in the court below so you would be deciding an issue that hadn't been addressed in the court below the court below decided the issue on gross negligence that their conduct did not rise to that level in light of her other findings, but the court never address that issue so you would be deciding an issue. Never decided in the court below. We do not have to adopt the rationale of the district court. No, you don't you could come to some other conclusion except that issue as to proximate cause of the gross negligence claim was never addressed by any party that I'm aware of. It's in your opponents brief and I thought that I'm judge Neff referenced it but I can go back and check. Go ahead. I have one other question. All right. Mr Tiger. Do you agree that the report that was prepared concluded that the officers were that an officer doing rounds and cell checks would not have seen the vomit from from that angle. No, that's, and that's preposterous because they just that the camera can see it but somebody standing in a cell, much closer than a camera, able to view virtually everything would not see it as preposterous that suspends disbelief, you have to give you to suspend disbelief I guess you could believe that I don't think a rational. I'm sorry. That's not exactly true because you have different angles. But the question I asked was whether there was a conclusion in the report that an officer who was just doing a cell check wouldn't have seen it. No, I'm not aware of that. Okay, I also say that Dr Spitz in his report did address the fact that at medical care been provided, he would have survived I want to address that also, I recall, Dr Spitz his report saying that. So you can look at Dr Spitz. Is there anything further. No, Your Honor. Thank you. Okay, well, thank you both for your argument we'll consider the case carefully.